**United States District Court for the Eastern District of Texas**

**Beaumont Division**

Jonathan Louis Lepow,
Petitioner,
v.                                                        **Case No. 4:22cr163**
Warden, FCI Beaumont Low,                    **Civil No. ___1:25cv265___**
Respondent.

## Petition for Writ of Habeas Corpus (Pro Se) Under 28 U.S.C. § 2241

### Introduction

Petitioner Jonathan Louis Lepow, a federal inmate at FCI Beaumont Low Camp, hereby petitions for a writ of habeas corpus under 28 U.S.C. § 2241. Petitioner challenges the failure of the Bureau of Prisons ("BOP") to timely process and submit his Residential Reentry Center ("RRC" or halfway house) placement paperwork, and to apply his earned and anticipated First Step Act ("FSA") Time Credits toward transfer to prerelease custody. Petitioner's projected release date is October 27, 2025, and he is eligible for FSA Time Credits and prerelease custody under 18 U.S.C. § 3624(g). As shown below, Petitioner has a **Low** recidivism risk classification (see Exhibit A, FSA Risk Assessment) and by August 2025 will begin accruing FSA Time Credits at **10 days per month** after his second Program Review (see Exhibit B, Program Review). Petitioner respectfully asks this Court to compel the BOP to perform its duty to assess and transfer him to appropriate prerelease custody (halfway house or home confinement) at the earliest practicable date, consistent with federal law and BOP's own policies. Petitioner also requests that the Court excuse any further administrative remedy exhaustion, as pursuing such remedies would be futile and cause irreparable delay in light of the rapidly approaching window for effective relief.

### Jurisdiction and Venue

This Court has jurisdiction under 28 U.S.C. § 2241 because Petitioner is **in custody** within the Eastern District of Texas and he challenges the **execution of his sentence,** namely the BOP's mismanagement of his sentence credits and prerelease placement. A § 2241 petition is the proper vehicle for an inmate challenging the manner in which the sentence is being carried out or the computation of credits and custody placement. Venue is proper in

the Beaumont Division of this District, as Petitioner is confined at FCI Beaumont Low, which is located in Jefferson County. Petitioner names the Warden of FCI Beaumont Low as Respondent, as the Warden is his immediate custodian for habeas purposes.

**Factual Background**

- **Custody and Sentence:** Petitioner is serving a federal sentence at FCI Beaumont Low Camp. His BOP Register Number is 97809-509. His current projected release date is **October 27, 2025** (via Good Conduct Time credit). Petitioner has been classified throughout his term as a **minimum security, low-risk** inmate with exemplary conduct. He is participating in recommended Evidence-Based Recidivism Reduction programs and productive activities.

- **First Step Act Time Credits:** Under the First Step Act of 2018, eligible inmates can earn time credits for successful participation in recidivism-reduction programming. By law, an eligible inmate earns **10 days of time credits for every 30 days** of *successful program participation, and if the inmate maintains a* **Low** or **Minimum** recidivism risk through two consecutive assessments, he earns an *additional* 5 days (for a total of 15 days credit per 30 days). Petitioner's **PATTERN risk score** is Low (see Exhibit A), qualifying him to earn FSA credits. However, because Petitioner's initial risk assessment after intake was a Low, the BOP informed him that he will earn credits at 10 days/month until he maintains two consecutive assessments. Petitioner's **second Program Review** is scheduled for August 2025, after which he is expected to **begin accruing 10 days of FSA Time Credits per month** (as noted in Exhibit B). These credits will amount to roughly **20–30 days by his projected release** (and could be higher if additional programs are completed or if 15 days/month become available with continued Low risk status).

- **Prerelease Custody Eligibility:** Petitioner's Low risk classification, institutional record, and earned credits should make him eligible for transfer to **prerelease custody** (halfway house or home confinement) well *before* October 2025. The First Step Act provides that when a prisoner has earned time credits "in an amount that is equal to the remainder of [his] imposed term of imprisonment," the BOP **"shall"** transfer the prisoner to prerelease custody or supervised release, *if* certain criteria are met. Those criteria include that the prisoner has maintained a Low or Minimum recidivism risk through his last two assessments (or received warden approval notwithstanding any higher risk). Petitioner is on track to meet these conditions: he is already Low risk (Exhibit A) and is likely to maintain that status at his next assessment. Moreover, even aside from the FSA's credit-based early transfer provisions, the Second Chance Act of 2007 guarantees all inmates **individualized**

**consideration** for up to **12 months** of pre-release RRC placement (halfway house) to assist with reentry, pursuant to 18 U.S.C. § 3624(c). Congress mandated that **"all inmates are eligible"** for prerelease RRC placement consideration, to be assessed on an **individual basis**. In compliance, BOP policy requires that halfway house placements be determined by assessing each inmate's **reentry needs, public safety, and the responsible management of the prison population**, rather than by any blanket limitation.

- **BOP's Failure to Process Halfway House Placement:** Despite Petitioner's eligibility, as of the filing of this Petition (mid-2025), the BOP has not initiated the process of referring Petitioner for RRC placement or applying his forthcoming FSA credits. Ordinarily, pursuant to BOP guidance after the Second Chance Act, unit team staff are supposed to review inmates for RRC placement **17–19 months** before their projected release date. Petitioner is now within approximately **17 months** of release, yet no halfway house referral paperwork has been completed or submitted to the Residential Reentry Manager. Petitioner has inquired with his unit team and was told that "it's too early" or that the BOP is waiting for him to earn FSA credits before taking action. This response is contrary to law and policy: the BOP's **Program Statement 7310.04** and subsequent guidance make clear that the Bureau can and should transfer inmates to RRCs **as appropriate for their reentry needs** and is **"not restricted"** to the last 10% or 6 months of the sentence. In fact, under 18 U.S.C. § 3621(b), the BOP has authority to designate an inmate to any suitable correctional facility at any point, including community confinement; Program Statement 7310.04 explicitly notes that a halfway house (then "CCC") is considered a "penal or correctional facility" and **placement there need not be limited to six months or 10% of the sentence** if a longer period is deemed appropriate. Furthermore, BOP's 2013 guidance memo on community placements emphasizes that many inmates may require "several months up to the maximum of one year" in an RRC to accomplish reentry goals, and that **the duration of RRC placement should be driven by the inmate's individual needs and risk level**. For lower-risk inmates with strong support and minor children obligations (twins age 8 and son age 17, direct placement on **home confinement** is encouraged as the preferred option for prerelease custody. Petitioner is the sole breadwinner of his family. Petitioner fits squarely within the category of inmates who should receive the maximum feasible prerelease custody: he has employment and family support in the community, minimal risk of recidivism, and no disciplinary issues. Transitioning him to community placement as early as possible will facilitate his successful reentry while also serving the purposes of the First Step Act.

- **Exhaustion of Administrative Remedies:** Petitioner has made diligent but unsuccessful attempts to resolve this matter within the prison. He raised the issue of halfway house timing at his May 2025 Program Review (see Exhibit B notes) and via an Inmate Request to Staff. He was told informally that *"you will be a street release due the length of his sentence."* Given the BOP's inaction, Petitioner began the process of preparing this motion, requesting that his case manager be directed to submit his RRC referral. As of this filing, no placement has been submitted. Petitioner's release window is drawing near, and Petitioner contends that insisting on full exhaustion in this case will **further delay or even defeat** his ability to obtain any meaningful relief, since waiting for the administrative process to conclude could push the decision on his halfway house placement into late 2025, rendering any court order ineffectual. Accordingly, Petitioner requests that the Court **waive the exhaustion requirement** due to futility and urgent time constraints, as discussed in the Argument below.

**Legal Framework**

**First Step Act Time Credits and Prerelease Custody (18 U.S.C. §§ 3632(d) & 3624(g)):** Congress enacted the FSA in 2018 to incentivize federal inmates to participate in recidivism reduction programs by awarding time credits that reduce the time spent in prison. **18 U.S.C. § 3632(d)(4)** provides the rate at which credits are earned (10 days for every 30 days of successful program participation, plus an additional 5 days for maintaining Low/Minimum risk). These earned credits can be applied **toward early transfer to prerelease custody or early release to supervised release** under **18 U.S.C. § 3624(g)** once certain conditions are met. In particular, § 3624(g) provides that the BOP *"shall transfer"* an eligible prisoner to **prerelease custody** (i.e. RRC or home confinement) when the prisoner has earned time credits **equal to the remainder of his sentence** and has been determined to be at Low/Minimum risk (or has otherwise been approved for transfer despite a higher risk level). By law, the prisoner must also have had his remainder term computed and cannot be subject to a pending deportation order. In effect, for a Low-risk inmate who earns sufficient FSA credits, the statute promises earlier placement in a halfway house or home confinement for the length of time equivalent to those credits. This is a key benefit intended by the First Step Act: **"the First Step Act promise of... halfway house/home confinement time"** as a reward for programming. Petitioner acknowledges that the BOP retains discretion in how to deploy inmates to specific prerelease options (halfway house vs. home confinement) and must find placements that are practicable (e.g. based on bed availability). However, the statute's use of the word **"shall"** in § 3624(g) reflects a clear Congressional directive that qualifying inmates are to be transferred out of prison facilities and into community custody for their earned credit time, to the extent

practicable. The BOP **cannot simply ignore or unduly delay** the transfer of an eligible inmate, as doing so frustrates the law's purpose and the inmate's rights. Indeed, withholding earned time credits or failing to apply them timely can result in a prisoner being held in prison **longer than legally necessary**, which courts have recognized as a valid basis for habeas relief. For example, in one recent case an inmate earned FSA credits that should have moved him to a halfway house by July 2022; due to BOP's miscalculation and delays, he remained in prison **months past his eligibility date** and had to file a § 2241 petition to seek relief. Although that case was eventually dismissed as moot (because the inmate was belatedly transferred and released before the court's decision), it starkly illustrates the prejudice that delay can cause. Petitioner seeks to avoid a similar outcome here by obtaining judicial intervention before his opportunity for full prerelease custody is lost.

**Second Chance Act and Halfway House Placement (18 U.S.C. § 3624(c)):** The Second Chance Act ("SCA") (enacted 2008) expanded pre-existing law to **authorize up to 12 months** *of pre-release community confinement for federal prisoners.* Section 3624(c) directs the BOP to ensure, *"to the extent practicable,"* that inmates spend a portion of the final months of their sentence in community reentry programs (halfway house or home confinement) to facilitate reentry. While § 3624(c) itself does not guarantee a specific duration (and it caps home confinement to 6 months or 10% of the sentence), it clearly mandates the **BOP to consider and provide** an appropriate period of community confinement for each prisoner. The BOP's **Program Statement 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure**, and subsequent guidance, implement this mandate. Notably, Program Statement 7310.04 affirms that the BOP's broader designation authority under 18 U.S.C. § 3621(b) **allows it to place an inmate in a halfway house for more than the "last ten percent" or more than 6 months of the sentence if appropriate**. In other words, **the 12-month figure is a limit on an inmate's *guaranteed* pre-release RRC time, not a limit on BOP's power to transfer earlier**. The SCA also required the BOP to promulgate regulations ensuring that RRC placement decisions are made **on an individual basis** and in light of the five factors set forth in § 3621(b) (the inmate's resources, the offense characteristics, etc.). BOP accordingly issued guidance that **each inmate be reviewed 17–19 months before release for potential RRC placement**, and that all inmates—regardless of offense or background—are **eligible** *for consideration for the full 12-month RRC period. The **intent** is that if an inmate's reentry needs justify it, he should get as much halfway house time as necessary up to 12 months*. In practice, many inmates (especially those who are low risk or have shorter sentences) may not need the full year, but *the decision must be individualized*, not reflexively limited to a shorter period. Here, Petitioner contends that failing to initiate

his RRC referral with roughly 17 months left before release is inherently at odds with the SCA's requirements. By BOP's own standards, this is the time when the process should be underway. Petitioner's case is exactly the type where a robust pre-release placement is warranted: he has been incarcerated for several years, needs to secure post-release employment and housing (which a halfway house can assist with), and would benefit from transitional programming in the community. The BOP's inertia—whether due to oversight, bureaucratic delay, or misinterpretation of the FSA credit timing—undermines the very purpose of § 3624(c). Additionally, BOP guidance cautions that very short RRC placements (e.g. just a few weeks) are often insufficient to meet reentry needs, suggesting a minimum of 90 days and often several **months** are appropriate. Yet if the BOP delays referral much longer, Petitioner could end up with only a negligible halfway house term, which would defeat the goal of a "reasonable part" of the end-of-term in community transition.

**BOP Program Statements and Guidance:** Petitioner relies on BOP's own policies as persuasive authority that the relief he seeks is appropriate. Program Statement 7310.04 (dated Dec. 16, 1998) remains the core policy on halfway house placements. As noted, it explicitly states that the Bureau may designate inmates to a CCC (halfway house) **for periods longer than 6 months or 10% of the sentence, if warranted by the inmate's situation**. It also reiterates that home confinement placements are statutorily limited (6 months/10%), meaning halfway houses are the primary avenue for longer prerelease custody. A BOP memorandum issued after the SCA (Blake R. Davis Memo, May 14, 2013) reemphasized key **"Guiding Principles"** for RRC/home confinement decisions: "Program Statement 7310.04... requires that RRC placements be made based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly." and "The Second Chance Act emphasizes... all inmates are eligible for pre-release RRC placement consideration and are to be assessed on an individual basis.". The same memo instructs staff that many inmates may need up to the **"maximum of one year"** in an RRC to meet their needs, and that **lower-risk inmates should be steered toward direct home confinement** placements when appropriate. These policies and guidelines are binding on BOP staff and create a reasonable expectation for inmates like Petitioner that the BOP will timely consider them for prerelease placement. The failure to do so in Petitioner's case is arbitrary and contrary to law, absent some articulable reason (none has been provided to Petitioner).

### Argument

### I. Petitioner Clearly Qualifies for Prerelease Custody Placement Under 18 U.S.C. § 3624(g) and (c), and BOP's Failure to Act Violates These Provisions

Petitioner meets the criteria for prerelease custody both under the FSA's time-credit transfer provisions and under the Second Chance Act's general reentry placement mandate. By August 2025, Petitioner will have begun earning FSA Time Credits at a rate of 10 days per month (or more, if he continues to be Low risk). Given his short remaining sentence at that point (about 5 months from release in Dec. 2025), even a few months of earned credits could substantially advance the date when he is **eligible for transfer to community custody**. Notably, if Petitioner manages to earn, for example, ~60 days of FSA credits, the law contemplates that those credits *must* be applied to move him out of prison 60 days early (either to an RRC, home confinement, or supervised release). The BOP does not have discretion to ignore such credits—it "*may apply*" them when the threshold conditions are met, and in fact *must apply them in order to effectuate the statute's command that the prisoner be transferred once credits equal the remainder of the term*. Petitioner's case is on track for that scenario, and proactive steps should be taken now so that when the time comes, his transition is not delayed.

Even setting aside the FSA credits, Petitioner is plainly eligible for **maximum halfway house placement** under pre-FSA law. With approximately 5 months left on his sentence, he should be considered for placement *for that full duration,* as nothing in § 3624(c) or BOP policy precludes it. Courts have long held that while an inmate doesn't have an entitlement to the full 12 months, he **does have the right to have the BOP** *properly exercise its discretion* in making an **individualized determination** about the length of RRC placement, taking into account the statutory factors and the inmate's circumstances. Here, all indications are that if discretion were properly exercised, Petitioner would merit an extended RRC placement (or direct home confinement) because of his Low risk, need for community integration, and stable background. There is no legitimate penological purpose to keeping Petitioner in a prison facility until the very last weeks of his sentence when he could be productively working and rebuilding family and community ties under RRC supervision. Indeed, BOP's own research and policy recognize that lower-risk offenders do not benefit from lengthy institutional confinement at the end of their terms and are good candidates for community custody. The **First Step Act** underscored this by effectively **mandating earlier release to community supervision for those who put in the effort to rehabilitate**. Congress did not intend for the BOP to stonewall or procrastinate in implementing these transfers.

By failing to timely process Petitioner's halfway house referral, the BOP is violating 18 U.S.C. § 3624(c)'s requirement to *"ensure"* Petitioner receives a meaningful pre-release opportunity to adjust to the community. The Eastern District of Kentucky has observed that under the Second Chance Act, the BOP must make an **individualized determination** and consider each inmate for up to 12 months in an RRC; while the Act doesn't guarantee a year, it is an *"unambiguous directive"* prescribing the maximum time and requiring case-by-case evaluation. Petitioner's unit team appears to be abdicating this responsibility by simply delaying any consideration of his placement. Such inaction is effectively a **constructive denial** of the full consideration to which Petitioner is entitled. Given that the BOP's **17–19 month review window** is already upon Petitioner, the absence of any referral or plan strongly suggests that without court intervention, Petitioner will not receive the full benefit of the law.

Moreover, under the First Step Act's criteria in § 3624(g), Petitioner should be among those first in line for community transfer as his earned credits accrue. He has maintained a Low risk profile (satisfying § 3624(g)(1)(D)(i)) and has no disqualifying offenses or detainers. The **only thing preventing his transfer** as soon as his credits equal his remaining days is the BOP's administrative follow-through: the agency must calculate and apply the credits and then designate him to an appropriate community program. The BOP has acknowledged in public reports that there have been significant problems in **properly adding up and applying time credits** as case managers log participation. In some instances, inmates have been kept in prison for **months beyond** when they should have been transferred, due to bureaucratic inertia or halfway house capacity issues. While halfway house bed space can be a practical constraint, the law still requires BOP to make "every effort" to utilize available community resources so that inmates can use their credits. Petitioner asserts that the BOP's lack of urgency in his case reflects either a *systemic mismanagement* of the FSA implementation or an *erroneous view* that Petitioner must wait until some later date (e.g., his next Program Review or a certain number of months before release) to even be considered for transfer. Such a view would be inconsistent with the text of the FSA, which does **not** set any minimum timeframe prior to release for applying credits, but rather bases it on the proportion of the sentence served and risk level attained. Petitioner has served the majority of his sentence and has demonstrated reduced risk; he should not be made to wait until the last minute for a benefit Congress intended him to have.

In summary, the Court should find that Petitioner is *prima facie* eligible for prerelease custody and that the BOP's failure to act is **contrary to law** (or at least an abuse of discretion). The appropriate remedy under § 2241 is an order compelling the BOP to promptly evaluate Petitioner for halfway house or home confinement placement, taking into account his FSA credits and the statutory factors, and to **submit the necessary**

**referral paperwork immediately** so that he can be placed in a community program at the earliest date "practicable." This Court would not be micro-managing the BOP's discretion by issuing such an order; rather, it would be enforcing the **legal duties** and timelines that Congress and BOP's own policies have established. Courts have intervened in analogous situations where the BOP was refusing to consider or implement lawful criteria for community placement. For instance, when BOP previously had a policy categorically limiting halfway house time, multiple courts granted habeas relief requiring BOP to **reconsider inmates for the longer placements allowed by law** (after the policy was found unlawful). The relief Petitioner seeks is similarly a court directive to **follow the law** in Petitioner's case – nothing more, nothing less.

## II. Exhaustion of Administrative Remedies Should Be Waived Because Requiring Petitioner to Exhaust Would Be Futile and Cause Irreparable Harm Through Delay

As a general matter, federal prisoners must exhaust the BOP's Administrative Remedy Program (BP-9, BP-10, BP-11 appeals) before a court will entertain a § 2241 habeas petition. This exhaustion requirement is **prudential, not jurisdictional** – it is judge-made to ensure that the agency has an opportunity to correct its own errors and to develop the record. However, courts recognize that exhaustion is not an inflexible rule. **Exceptions** exist, notably where pursuing administrative remedies would be **futile** or where the petitioner would suffer **irreparable injury** if required to fully exhaust. In such cases, courts may excuse exhaustion and reach the merits in the interest of justice. Petitioner submits that his situation warrants such an exception.

First, futility: The relief Petitioner seeks is for the BOP to process his halfway house placement – *essentially to do something it is already required by statute and policy to do*. Petitioner has informally requested this and was met with staff responses indicating a **fixed position** that it's "too early" or not necessary to act now. This suggests that any administrative appeal would likely be denied on the same grounds (if not simply overtaken by events). More importantly, there is **no reasonable prospect that further internal appeals will result in timely relief**. Even if Petitioner fully exhausted and the Central Office eventually agreed with him in principle, that process could take 4–6 months or more. By then, Petitioner will be on the cusp of his release date or already within the window of what little halfway house time might remain. Courts have excused exhaustion where the administrative process **cannot grant effective relief in time**. Here, the very nature of Petitioner's claim is time-sensitive – every month of delay is a month of potential community placement lost. The purpose of exhaustion – to allow the agency to decide the issue – is arguably fulfilled in spirit here because the issue is a **pure question of applying policy and law to Petitioner's circumstances**, something on which the BOP's stance is

essentially predetermined by its (mis)application of the FSA and SCA. There are no complex factual disputes that need administrative development; it is undisputed Petitioner is low risk, has a release date in Oct. 2025, and will earn credits from Aug. 2025 onward. The question is whether BOP must act now or can wait – a question of law and policy that a court is well-positioned to decide without the delay of administrative ping-pong.

Second, irreparable harm from delay: If Petitioner is forced to wait for administrative remedies, he likely will **miss the optimal window** for halfway house placement. By the time a final denial comes (say, late 2025), Petitioner might have, at best, a few weeks left to serve – at which point an RRC transfer is largely symbolic or even moot. The *Fifth Circuit* has acknowledged that exceptions to exhaustion can apply "in situations in which exhaustion would be futile". Other courts have noted that requiring exhaustion is not necessary when it **"would not promote the policies behind the requirement"** – such as when exhaustion would cause the issue to become moot or the relief ineffective. That is precisely the case here. Every day that Petitioner remains in prison instead of a halfway house (when he should lawfully be in community custody) cannot be recovered. It is time lost with family, time lost rebuilding his life, and time spent in a more restrictive environment than what Congress deemed appropriate for someone in his position. Monetary compensation is not available for such a loss; thus, the harm is irreparable. The habeas remedy is essentially Petitioner's only chance to *prevent* the over-incarceration before it happens.

Furthermore, insisting on exhaustion in this case could perversely incentivize the BOP to **run out the clock** on inmates' claims. Petitioner notes that in other FSA time-credit cases, the BOP has sometimes delayed action until the inmate's release, then argued the petition is moot. That sequence played out in the case of Dr. Potarazu mentioned earlier: the inmate had to stay in prison 8–10 months longer than he should have, litigated, and ultimately the case was dismissed as moot after he belatedly got to a halfway house. The court in that case could offer no remedy because the sentence had effectively ended. We *should not allow Petitioner's case to follow the same trajectory. The exhaustion doctrine is* not meant to be a **trap** that prevents inmates from ever obtaining meaningful review of their claims; it is meant to ensure efficient and fair resolution of grievances. Here, efficiency and fairness weigh in favor of excusing further exhaustion.

Petitioner has at least attempted the first step (Informal Resolution) and effectively received no timely response. The administrative process is at a standstill when urgent *action is needed. Petitioner respectfully contends that he has done all that can reasonably* be expected under the circumstances to resolve this matter without court intervention. Any further insistence on paperwork would only serve to **delay justice**. Accordingly, this Court

should **waive the exhaustion requirement** and reach the merits of the petition **"as law and justice require."** (Habeas corpus, after all, is a flexible writ that has traditionally allowed courts to bypass exhaustion where it would unduly burden the petitioner's rights.)

### III. This Court Has Authority Under 28 U.S.C. § 2241 to Grant the Requested Relief, and Judicial Intervention Is Appropriate Here

The writ of habeas corpus under § 2241 empowers district courts to order the release of prisoners held "in custody in violation of the Constitution or laws... of the United States." 28 U.S.C. § 2241(c)(3). In this case, Petitioner asserts that the BOP's retention of him in a secure facility instead of transferring him to authorized community confinement amounts to custody in violation of the **laws of the United States** – specifically, 18 U.S.C. §§ 3624(c) & 3624(g), as amended by the SCA and FSA. If an inmate has a clear legal entitlement to be in a less restrictive form of custody (or to outright earlier release) and the BOP refuses to effectuate it, courts have recognized this as a valid basis for habeas relief. **Numerous precedents** support the use of § 2241 to challenge the execution of a sentence, which includes the computation of credits and the place or conditions of confinement affecting the duration of custody. For example, when the BOP miscalculates good-conduct time or fails to award earned credits, prisoners routinely seek habeas relief and courts order recalculation and earlier release if warranted. The present situation is analogous – it involves the proper calculation and application of **FSA earned time credits** and the resultant placement in community custody.

To be sure, the BOP will likely argue that decisions about RRC placement are committed to its discretion and not subject to judicial review. It is true that under 18 U.S.C. § 3625, the Administrative Procedure Act (APA) does not apply to BOP decisions under §§ 3621–3624. But Petitioner is **not** invoking the APA; he is invoking habeas corpus, which is a separate and well-established avenue for relief when imprisonment is unlawful. While courts will not micro-manage every discretionary decision of prison officials, they *will intervene* when an agency's actions **contradict a statutory mandate or exceed statutory authority**. Here, Petitioner is not asking the Court to dictate exactly how long of an RRC placement he *must* receive or to usurp the BOP's discretion in assessing his needs – rather, Petitioner asks the Court to ensure that the BOP **complies with the mandates of § 3624** by promptly considering him for transfer and not arbitrarily delaying or denying his move to community custody for which he qualifies. This is a classic situation where habeas relief is appropriate to compel the warden to execute the sentence **in accordance with the law**.

Courts have, in past cases, ordered the BOP to revisit RRC determinations when they were based on illegal rules or when the BOP failed to consider the proper criteria. For instance, after the Second Chance Act, if a warden were to categorically limit all inmates to 6-month placements without individualized review, courts uniformly held such action unlawful and granted relief (often by ordering reconsideration of the placement using the correct factors). Petitioner's case is arguably stronger: the BOP isn't even **making** a decision, it is simply inaction that flouts its legal obligations. Such inaction can be seen as a **constructive refusal** to transfer, equivalent to an improper denial. In *Elwood v. Jeter*, the Eighth Circuit noted that while an inmate isn't guaranteed halfway house placement, he "**is entitled to have the BOP consider**" him for such placement in a manner consistent with the law (386 F.3d 842, 846–47 (8th Cir. 2004)). The First Step Act has turned some of those considerations into more mandatory terms (with the "shall transfer" language when credits equal remaining time). Thus, the judicial role here is not to second-guess a discretionary call, but to ensure the **BOP does not ignore binding law and policy**.

It is also notable that Petitioner's request – essentially to be moved to a different form of custody (community-based instead of prison) – does not run afoul of any jurisdictional or prudential barriers for habeas relief. Some jurisdictions have debated whether a transfer to home confinement or RRC is cognizable under habeas (since technically the inmate is still "in custody" serving the sentence). However, the weight of authority holds that when the custody classification has a **significant effect on the duration or execution of the sentence**, it is within the scope of § 2241. Here, having Petitioner in an RRC months earlier is a profound change to the execution of his sentence (it is the difference between prison and quasi-freedom) and is tethered to the entitlement created by statute. Petitioner urges this Court to follow the reasoning of courts that have entertained similar claims under § 2241, rather than any overly narrow view that could leave prisoners without any remedy for BOP's failure to carry out clear statutory directives.

In conclusion on this point, **judicial intervention is not just appropriate but necessary** to give effect to the First Step Act's incentives and the Second Chance Act's promise of reentry support. If the BOP were correctly following the law, this petition would not be necessary. The very fact that Petitioner has had to file demonstrates a breakdown in the administrative process that the Court can remedy by issuing the writ. The habeas writ has historically been called upon to prevent unjustified detention – keeping Petitioner in a secure facility when he should be in a halfway house or home confinement is, in a very real sense, **detaining him in excess of what Congress has authorized**. Thus, granting relief here upholds the law and imposes only a minimal burden on Respondent: to do what it *should have already done* – start Petitioner's transition to the community.

**Relief Requested (Prayer for Relief)**

For the foregoing reasons, Petitioner Jonathan Louis Lepow respectfully requests that this Court enter an Order granting the writ of habeas corpus and providing the following relief:

1. **Declare** that the Bureau of Prisons' failure to timely apply Petitioner's earned and imminent FSA Time Credits and to consider him for prerelease custody (halfway house or home confinement) in accordance with 18 U.S.C. § 3624 is unlawful.

2. **Direct** Respondent (the Warden of FCI Beaumont Low) and the BOP to **immediately calculate Petitioner's earned FSA Time Credits as stated in the attached Memorandum from the Director of the BOP resulting in the Petitioners Transition to Community Date and** apply those credits toward advancing his prerelease custody placement date, as required by 18 U.S.C. § 3624(g).

3. **Issue a mandatory injunction** (or corresponding habeas writ) compelling Respondent and the BOP to **promptly transfer Petitioner to an appropriate Residential Reentry Center or to home confinement** for the remainder of his sentence *as soon as possible*, or by a date certain to be determined by the Court (for example, order that Petitioner's RRC placement commence no later than **at least 4 months before his current release date**, absent a specific finding by BOP of some individualized factor justifying a shorter placement).

4. In the alternative, **remand** the matter to the BOP with instructions to: (a) *immediately submit Petitioner's referral packet for RRC placement to the* appropriate Residential Reentry Manager, with a recommendation that Petitioner receive the maximum allowable prerelease custody consistent with his needs and credits; and (b) file a notice or report with this Court confirming the steps taken and the date set for Petitioner's transfer to prerelease custody.

5. Award any further relief that this Court deems just and proper, including but not limited to attorneys' fees or costs (if applicable) or retention of jurisdiction to monitor compliance.

Petitioner emphasizes that time is of the essence. He therefore asks that the Court grant expedited consideration of this Petition. Petitioner is prepared to file any additional documentation or briefing the Court may require. He thanks the Court for its attention to this urgent matter of personal liberty and statutory compliance.

Respectfully submitted,

*Jonathan Lepow*
_____

**Jonathan Louis Lepow** (Pro Se)
Reg. No. 97809-509
FCI Beaumont Low – Satellite Camp
P.O. Box 26020
Beaumont, TX 77720
*Date: June 2, 2025*

## Certificate of Service

I, Jonathan Louis Lepow, hereby certify that on this *2nd day of* June 2025, a true and correct copy of the foregoing Petition was placed in the outgoing legal mail receptacle at FCI Beaumont Low Camp, **postage prepaid**, pursuant to the prison mailbox rule. I further certify that service is being made by U.S. Mail to:

**Clerk of Court**
**United States District Court, Beaumont Division**
**300 Willow St.**
**Beaumont, TX 77701**

I declare under the penalty of perjury that the foregoing is true and correct.

Date: June 2, 2025.

Jonathan Lepow
_____

Jonathan Louis Lepow, Pro Se



**U.S. Department of Justice**
**Federal Bureau of Prisons**

---

**FOR IMMEDIATE RELEASE**
May 28, 2025

Contact: Office of Public Affairs
202-514-6551

### Federal Bureau of Prisons Issues Directive to Expand Home Confinement, Advance First Step Act

**WASHINGTON, DC** - The Federal Bureau of Prisons (BOP or Bureau) has announced new guidance from Director William K. Marshall III directing staff to expand the use of home confinement for eligible individuals under the First Step Act (FSA) and Second Chance Act (SCA). The directive is rooted in the principle of smart, fair criminal justice reform—reform that began when President Donald J. Trump disrupted entrenched political paralysis and signed the FSA into law, delivering the most significant overhaul to the federal justice system in a generation.

This latest policy reinforces the Bureau's responsibility to uphold the law and ensure that eligible incarcerated individuals—particularly those who do not require transitional services at Residential Reentry Centers (RRCs)—are transferred to home confinement as soon as statutorily possible. This approach not only honors the bipartisan vision behind the FSA but also reflects the commitment to give second chances to those who have paid their debt and are ready to safely return to their communities.

"President Trump said he would fight for the forgotten men and women of this country, and the First Step Act proved he meant it," said Director Marshall. "Now, we are ensuring that this reform continues to work—not just as a policy, but as a promise to Americans seeking redemption and a path forward."

The new directive outlines the following expectations for staff:

- **Home confinement is a priority** for individuals who are eligible and do not require the structured support of an RRC. RRC placement will be reserved for those with the greatest need.

- **Use of Conditional Placement Dates:** Unit Teams must use FSA and SCA Conditional Placement Dates—based on projected Earned Time Credits (FTCs) expected to earn—to guide prerelease planning and ensure accurate and timely referrals.

- **Clarification of Statutory Authority:** Staff must distinguish between FSA and SCA eligibility criteria, applying time credits appropriately and understanding the limits of each statute, particularly when determining duration of prerelease custody. There is **no restriction** concerning how many FTCs may be applied toward home confinement.

- **Individualized Referral Process:** Decisions will be based on each person's needs, support systems and readiness for reintegration.

This directive builds on the success of the First Step Act, which has helped individuals return to their communities with a recidivism rate significantly lower than the national average. It recognizes that real lives have been changed and communities made safer—proof that smart reform and public safety can go hand-in-hand.

The Bureau remains committed to the rule of law and the fair treatment of all individuals in its custody. As President Trump has shown in both word and action, second chances are not just possible—they are necessary for a justice system worthy of the American people.

This directive is a critical step toward continuing that legacy. In President Trump's second term, the promise of reform will not only be preserved—it will be completed.

###



**Individualized Needs Plan - Program Review**    (Inmate Copy)

SEQUENCE: 02408455
Team Date: 05-22-2025

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate LEPOW, JONATHAN LOUIS 97809-509

| | | Proj. Rel. Date: -10-27-2025 - |
|---|---|---|
| Facility | BML BEAUMONT LOW FCI | Proj. Rel. Mthd: FULL TERM RELEASE |
| Name: | LEPOW, JONATHAN LOUIS | DNA Status: BML10684 / 05-01-2025 |
| Register No. | 97809-509 | |
| Age: | 45 | |
| Date of Birth: | 11-01-1979 | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

**Inmate Photo ID Status**

No photo ID - Expiration: null

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | C-LOCKUSP | USP LOCK DOWN CREW | 05-21-2025 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | ESL HAS | ENGLISH PROFICIENT | 05-08-2025 |
| BML | GED HAS | COMPLETED GED OR HS DIPLOMA | 05-08-2025 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| NO COURSES | | | | |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE2 | STABLE, CHRONIC CARE | 05-01-2025 |
| SCRN1-MH | SCRN1-MENTAL HEALTH | 12-27-2024 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| HGT RESTR | NO LADDERS/NO UPPER BUNK | 05-01-2025 |
| LOWER BUNK | LOWER BUNK REQUIRED | 05-01-2025 |
| NO DRIVING | NO DRIVING-MEDICAL CONDITION | 05-01-2025 |
| REG DUTY W | REGULAR DUTY W/MED RESTRICTION | 05-01-2025 |
| YES F/S | CLEARED FOR FOOD SERVICE | 05-01-2025 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| ED WAIT HX | DRUG EDUCATION WAIT-RQ HIST | 05-01-2025 |

**FRP Payment Plan**

Most Recent Payment Plan

** NO FRP DETAILS **

**FRP Deposits**

Trust Fund Deposits - Past 6 months:  $716.00        Payments commensurate ?  N/A

New Payment Plan:  ** No data **

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 05-20-2025 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 04-30-2025 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 04-30-2025 |

Sentry Data as of 05-23-2025        Individualized Needs Plan - Program Review  (Inmate Copy)        Page 1 of 3



# FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:97809-509, Last Name:LEPOW

DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

Register Number: 97809-509

Inmate Name

Last.........: LEPOW

First.......: JONATHAN

Middle.......: LOUIS

Suffix.......:

Gender.......: MALE

Risk Level Inmate....: R-LW

General Level......: R-LW (12)

Violent Level......: R-MIN (6)

Security Level Inmate: MINIMUM

Security Level Facl..: MINIMUM

Responsible Facility.: BML

Start Incarceration..: 04/29/2025

## PATTERN Worksheet Summary

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 45 | 14 | 8 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | FALSE | 0 | 0 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -2 | -2 |
| Drug Program Status | NoDAPCompletion | 0 | 0 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | N/A | 0 | 0 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 0 | 0 | 0 |
| Work Programs | 0 | 0 | 0 |
| Total | | 12 | 6 |

## PATTERN Worksheet Details

Item: Programs Completed, Value: 0

General Score: 0, Violent Score: 0

Risk Item Data

No Data

---------------------------------------------------------------------

Item: Work Programs, Value: 0

General Score: 0, Violent Score: 0

Risk Item Data

No Data



Individualized Needs Plan - Program Review   (Inmate Copy)

SEQUENCE : 02408455
Team Date : 05-22-2025

Dept. of Justice / Federal Bureau of Prisons

Seen in the inmate: LEPOW, JONATHAN LOUIS  87828-509

| Description | Start |
|---|---|
| NEED - CONDITIONS NO | 04-30-2025 |
| NEED - DYSLEXIA NO | 05-09-2025 |
| NEED - FINANCE/POVERTY YES  * | 05-01-2025 |
| NEED - FAMILY/PARENTING NO | 04-30-2025 |
| NEED - MENTAL HEALTH NO | 05-17-2025 |
| NEED - MEDICAL NO | 05-01-2025 |
| NEED - RECLEISURE/FITNESS YES  * | 05-01-2025 |
| NEED - WORK YES  * | 05-05-2025 |
| LOW RISK RECIDIVISM LEVEL | 05-20-2025 |

**Progress since last review**

Initial Program Review.

**Next Program Review Goals**

Inmate Lepow needs to enroll in Personal Finance by 8/2025.

**Long Term Goals**

Inmate Lepow needs to complete Personal Finance by 11/2025.

**RRC/HC Placement**

No.
Insufficient time to process RRC referral.

**Comments**

SCH409 reviewed and current.
Inmate was given a copy of his pattern score. Yes.
FSA: Eligible
Recidivism level: Low
Next Program Review: 08-15-2025
Next Scoring of the Male Custody Classification: 08-15-2025
Custody Classification

Sentry Data as of 05-23-2025

Jonathan Louis Lepow
Reg. NO97809-509
FCI Beaumont Low - Satellite Camp
P.O. Box 26020
Beaumont, Tx 77720

Clerk of Court
United States District Court
Beaumont Division
300 Willow St.
Beaumont, Tx
77701

